## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### Holding a Criminal Term

### Grand Jury Sworn in on November 3, 2016

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL NO.** |
| | : | |
| | : | **Grand Jury Original** |
| **v.** | : | |
| | : | **VIOLATIONS:** |
| | : | |
| **JEAHO JUNG** | : | **18 U.S.C. § 371** |
| | : | **(Conspiracy)** |
| **and** | : | |
| | : | **50 U.S.C. § 1705** |
| **EIGHT CORPORATION,** | : | **(International Emergency Economic** |
| | : | **Powers Act)** |
| **Defendants.** | : | |
| | : | **22 U.S.C. 2778** |
| | : | **(Arms Export Control Act)** |
| | : | |
| | : | **18 U.S.C. § 1001** |
| | : | **(Material False Statement)** |
| | : | |
| | : | **18 U.S.C. § 1956(h)** |
| | : | **(Conspiracy to Launder Monetary** |
| | : | **Instruments)** |
| | : | |
| | : | |
| | : | **FORFEITURE:** |
| | : | |
| | : | **18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1);** |
| | : | **21 U.S.C. § 853(p); 28 U.S.C. § 2461(c)** |

# INDICTMENT

The Grand Jury charges that:

## COUNT ONE

### (Conspiracy To Unlawfully Export U.S.-Origin Goods to China and To Defraud the United States)

At all times material to this Indictment:

### Defendants

1.     Defendant JEAHO JUNG ("JUNG") was a South Korean national who was the President of EIGHT CORPORATION.

2.     Defendant EIGHT CORPORATION (hereinafter "8C") was a company based within South Korea.

### The Arms Export Control Act ("AECA") and the International Emergency Economic Powers Act ("IEEPA")

#### A.  AECA, 22 U.S.C. § 2778

3.     The AECA authorizes the President of the United States, among other things, to control the export of "defense articles." 22 U.S.C. § 2778(a)(1).  The AECA also gives the President the authority to designate items as "defense articles." *Id.*  As a practical matter, that task is performed by the Department of State ("DOS"), which is located in Washington D.C., with the concurrence of the Department of Defense ("DOD"), in accordance with regulations that are promulgated by the Directorate of Defense Trade Controls ("DDTC"). 22 C.F.R. §§ 120.1(a) and 120.2.  The regulations promulgated by the DDTC are known as the International Traffic in Arms Regulations ("ITAR"), and specify which items are designated as defense articles.  All defense articles are identified by category on the United States Munitions List ("USML").

4.      Category XI of the USML includes military and space electronics specifically designed, modified or configured for military use.   The category includes radar systems, underwater sound equipment, electronic combat equipment, command and control communications systems, space electronics, and all specifically designed or modified components, parts, accessories, attachments and associated equipment for the articles in this category.

5.      Category XV of the USML includes spacecraft systems and associated equipment specifically designed or modified for military use.   This category includes all varieties of satellites, including communication satellites, remote sensing satellites, scientific satellites, as well as radiation microelectronic circuits which meet certain characteristics, and all specifically designed or modified systems or subsystems, and components, parts, accessories, attachments, and associated equipment for the articles in this category.

6.      In order to export any item determined to be on the USML, the exporter must register with the DDTC, which is located in Washington D.C., and obtain an export license from the DDTC before the item can permanently leave the United States.   *See* 22 U.S.C. § 2778(b)(2) and 22 C.F.R. § 123.1(a).

7.      Since 1990, the U.S. Government has maintained an arms embargo against the PRC that prohibits the export, re-export, or re-transfer of any defense article to the People's Republic of China ("China").   It is the policy of the United States and the DOS to deny license applications and any other written requests for the export, re-export, or re-transfer of any defense articles covered by the USML.

8.      It is a crime for anyone to willfully violate any provision of 22 U.S.C. § 2778 or any rule or regulation issued under that section.   *See* 22 U.S.C. § 2778(c).   Specifically, it is a

crime for any defense article exporter to willfully fail to obtain an export license before exporting a defense article to another country. *See* 22 U.S.C. § 2778(c) and 22 C.F.R. § 127.1(a)(1). Pursuant to the ITAR, it is a violation for a person to conspire to export or to cause to be exported any defense article without a license. *See* 22 C.F.R. § 127.1. It is also unlawful for any person to "knowingly or willfully cause, or aid, abet, counsel, demand, induce, procure, or permit the commission of any act prohibited by 22 U.S.C. § 2778," or any regulation issued thereunder. 22 C.F.R. § 127.1(d).

**B. IEEPA, 50 U.S.C. § 1705**

9.       Under the International Emergency Economic Powers Act ("IEEPA"), Title 50, United States Code, Sections 1701-1707, the President of the United States was granted authority to deal with unusual and extraordinary threats to the national security, foreign policy, or economy of the United States. 50 U.S.C. § 1701(a). Pursuant to that authority, the President may declare a national emergency through Executive Orders that have the full force and effect of law. Among other things, the IEEPA empowers the President to issue regulations governing exports from the United States.

10.       Pursuant to the IEEPA, on August 17, 2001, the President issued Executive Order 13,222, which declared a national emergency with respect to the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States in light of the expiration of the Export Administration Act ("EAA"), 50 App. U.S.C. §§ 2401-2420, which lapsed on August 17, 2001. 66 Fed. Reg. 44,025 (Aug. 22, 2001). While in effect, the EAA regulated the export of goods, technology, and software from the United States. Pursuant to the provisions of the EAA, the Department of Commerce ("DOC"), Bureau of Industry and Security ("BIS"), promulgated the Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774,

which contained restrictions on the export of goods outside of the United States, consistent with the policies and provisions of the EAA. *See* 15 C.F.R. § 730.2. In Executive Order 13222, pursuant to IEEPA, the President ordered that the EAR's provisions remain in full force and effect despite the expiration of the EAA. Presidents have issued annual Executive Notices extending the national emergency declared in Executive Order 13222 from the time period covered by that Executive Order through the present. *See, e.g.,* 81 Fed. Reg. 52,587 (Aug. 8, 2016).

11.     Under IEEPA, it is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any order, license, regulation, or prohibition issued pursuant to the statute. 50 U.S.C. § 1705(a). Willful violations of the EAR constitute criminal offenses under IEEPA, and carry a 20-year maximum term of imprisonment and up to a $1,000,000 fine. 50 U.S.C. § 1705(c).

12.     Through the EAR, BIS reviews and controls the export from the United States to foreign countries of certain U.S. items. 15 C.F.R. §§ 734.2-.3. In particular, BIS has placed restrictions on the export and re-export of items that it has determined could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States. Under the EAR, such restrictions depend on several factors, including the technical characteristics of the item, the destination country, the end user, and the end use.

13.     The most sensitive items subject to EAR controls were identified on the Commerce Control List ("CCL") set forth in Title 15, Code of Federal Regulations, part 774, Supplement Number 1. Items listed on the CCL were categorized by Export Control

Classification Number ("ECCN"), each of which had export control requirements depending on destination, end use, and end user.

14.     Certain power amplifiers discussed below are listed on the CCL and categorized under ECCN 3A001, Electronic Components.  Under the EAR, a BIS license was required to export these items from the United States to the Peoples Republic of China.

### Classifications of Commodities Related to Each Transaction

15.     As set forth fully below, this indictment involves 23 transactions, each involving separate commodities.

16.     The transactions in Counts Two and Three below involved export controlled Radiation Hardened Integrated Circuits ("RHICs") 5962R9689109VXC and UT9Q512K32E-25SWC, respectively, which would most commonly be used in space applications, such as for satellites or space vehicles.  According to the DDTC, at all times relevant to this Indictment, these RHICs were defense articles under Category XV(e) of the USML subject to DDTC's ITAR licensing jurisdiction.

17.     The transactions in Counts Four and Twenty-Four below involved export controlled Radio Frequency Amplifiers ("RFAs") TGA2573, which are used in military radar, communications, electronic warfare, electronic counter measures, and test equipment. According to the DDTC, at all times relevant to this Indictment, these RFAs were defense articles under Category XI(c) of the USML subject to DDTC's ITAR licensing jurisdiction.

18.     The transactions in Counts Five through Twenty-Two below involved export controlled Power Amplifiers ("PAs").  Each transaction involved separate PAs, however some were included in multiple transactions.  The PAs and respective ECCNs, included in these transactions were:

| PA | ECCN |
|---|---|
| HMC-1029 | 3A001.b.2.d |
| HMC-998LP5E | 3A001.b.2.c |
| HMC-ALH445 | 3A001.b.2.d |
| HMC-943LP5E | 3A001.b.2.c |
| HMC-519 | 3A001.b.2.d |
| HMC-6981LS6 | 3A001.b.2.c |
| HMC-906 | 3A001.b.2.d |
| HMC-635 | 3A001.b.2.d |
| HMC-C023 | 3A001.b.4.f3 |
| HMC-518 | 3A001.b.2.d |
| HMC-AUH249 | 3A001.b.2.d |

As such, these PAs are subject to the DOC licensing jurisdiction.

19. The transaction in Count Twenty-Three below was for RHICs UT9Q512E-20YPC and UT28F256QLET-45UPC, which are most commonly used in space applications, such as for satellites or space vehicles. At all times relevant to this Indictment, these RHICs were subject to either DDTC's ITAR licensing jurisdiction or DOC's licensing jurisdiction.

**Export and Shipping Records**

20. Pursuant to United States laws and regulations, exporters and shippers or freight forwarders were required to file certain forms and declarations concerning exports of goods and technology from the United States. Typically, those filings are completed through the submission of Electronic Export Information ("EEI") in the Automated Export System ("AES") administered by the United States Department of Homeland Security ("DHS"), Customs and Border Protection, which is headquartered in the District of Columbia.

21. An essential and material part of the EEI is information concerning the ultimate consignee (commonly known as "end-user") and the country of ultimate destination of the

export. In many cases, the identity and location of the ultimate consignee determines whether the goods may be exported: (a) without any specific authorization from the United States Government; (b) with specific authorization in the form of a license from the United States Department of Commerce, the United States Department of State, or the United States Department of the Treasury; or (c) whether the goods may not be exported from the United States.

22. The EEI is equivalent to a statement to the United States Government that the transaction occurred as described. The data from the EEI is used by the United States Bureau of the Census to collect trade statistics and by the United States Department of Commerce, Bureau of Industry and Security, which is located in the District of Columbia, for export control purposes.

### Venue

23. The conduct alleged in this Count began outside of the jurisdiction of any particular State or district and later occurred within the District of Columbia and elsewhere and is therefore within the venue of the United States District Court for the District of Columbia, as provided by 18 U.S.C. §§ 3238 and 3237(a).

### THE CONSPIRACY

24. Beginning as early as on or about May 6, 2013, and continuing through on or about October 8, 2014, defendants JUNG and 8C did willfully combine, conspire, and agree with others known and unknown to the Grand Jury, to: (a) commit an offense against the United States, that is, to export and cause the exportation of defense articles from the United States to China absent a DDTC license, in violation of Title 22, United States Code, Section 2778; (b) export and cause the exportation of CCL items from the United States to China, through

Hong Kong, without first obtaining a DOC export license, in violation of Title 50, United States Code, Section 1705; (c) defraud the United States Government by interfering with and obstructing a lawful government function, that is, the enforcement of laws and regulations prohibiting the export or supply of goods from the United States to China without having first obtained the required licenses from DDTC and DOC, by deceit, craft, trickery, and dishonest means, in violation of Title 18, United States Code, Section 371.

## OBJECTS OF THE CONSPIRACY

25.    The objects of the conspiracy were:

a.    to acquire U.S.-origin goods from the United States to supply to entities and end-users in China;

b.    to conceal from United States companies and the United States Government that the U.S.-origin goods were destined for Chinese end-users;

c.    to make a financial profit for defendants and other conspirators; and

d.    to evade the regulations, prohibitions, and licensing requirements of the DDTC and DOC.

## MANNER AND MEANS OF THE CONSPIRACY

26.    The manner and means by which defendants and other conspirators sought to accomplish the objects of the conspiracy included, among others, the following:

a.    Defendants and other conspirators planned and acted outside of the United States to acquire U.S.-origin goods.

b.    Defendants used e-mail to communicate with one another and with other individuals, including individuals located in the United States, Hong Kong, and China.

c.     Defendants and other conspirators solicited purchase orders for U.S.-origin goods from companies in the United States to China, through South Korea.

d.     Defendants and other conspirators wired money from accounts outside the United States to accounts of United States companies inside the United States, as payment for the purchase of U.S.-origin goods.

e.     Defendants and other conspirators intentionally concealed from companies, shippers, and freight forwarders located in the United States the ultimate end-use and the true identity of the end-users of the U.S.-origin goods.

f.     Defendants and other conspirators intentionally submitted or caused to be submitted false information on SEDs to the United States Government, concealing from the United States Government the ultimate end-use and the true identity of the end-users of the U.S.-origin goods.

g.     Defendants and other conspirators caused exports of U.S.-origin goods to be made from the United States to South Korea, for subsequent transshipment to China.

## OVERT ACTS

27.     In furtherance of the above-described conspiracy, and in order to carry out the object thereof, defendants and others known and unknown to the Grand Jury committed or caused to be committed, in the District of Columbia and elsewhere, at least one of the following overt acts, among others:

### *U.S. Company 1 Orders*

28.     On or about August 16, 2013, and October 17, 2013, JUNG placed two orders with a U.S. manufacturer of RHICs (U.S. Company 1).  The first order (SI-FORD-12192) was for ten RHICs, part number 5962R9689109VXC, for a total purchase price of $27,170.00.  The

second order (SI-FORD-12218) was for ten RHICs, part number UT9Q512K32E-25SWC, for a total purchase price of $20,140.

29.     In order to apply for a DDTC export license, end user information is required. JUNG submitted End-User Certificates ("EUCs") for both orders.  The EUCs listed 8C as the foreign consignee and a South Korean company called Genohco as the end user.  JUNG signed the EUCs purporting to be a Genehco employee.  HSI and the Seoul Metropolitan Police Agency ("SMPA") interviewed a company manager at Genohco, who confirmed that Genehco was not the end user.

30.     Based on JUNG's and 8C's false representations in the two EUCs, on or about December 13, 2013, the DDTC approved export license #050489864 for ten (10) UT9Q512K32E RHICs, and on or about December 20, 2013, the DDTC approved a second export license #050483870 for the ten (10) 5962R9689109VXC RHICs.  Both export licenses authorized the export of the ITAR-controlled RHICs to South Korea only for end use by Genohco in South Korea.

31.     On or about January 10, 2014, JUNG caused U.S. Company 1 to ship ten pieces of part UT9Q512K32E from the United States to South Korea via FedEx.  On or about January 16, 2014, JUNG caused U.S. Company 1 to ship ten pieces of part 5962R9689109VXC from the United States to South Korea via FedEx.  JUNG and 8C caused both exports to be filed in AES with the fraudulently obtained DDTC export licenses.  JUNG and 8C knew that Genohco was not the true end-user for the items.  JUNG and 8C also knew that China, not South Korea, was the ultimate destination for the items.  JUNG and 8C further knew that had they requested a license to export to China, it would have been denied.

## U.S. Company 2 Order

32.    On or about June 10, 2013, JUNG placed an order for 100 TGA2573 RFAs with a U.S. distributor of those products (U.S. Company 2), for a total purchase price of $47,057.00.

33.    On or about June 19, 2013, JUNG provided U.S. Company 2 with an EUC that identified the end user as the Korea Environment Corporation ("KECO") and the "Country of Ultimate Destination" as South Korea.  HSI and SMPA interviewed a company manager at KECO, who confirmed that JUNG filed a false EUC, as KECO was not the end user.

34.    Based on JUNG's and 8C's false representations on the EUC, on or about January 6, 2014, the DDTC approved an export license (#050488119) for the 100 TGA2573 RFAs.  The license authorized the export of the ITAR-controlled TGA2573 RFAs only for end use by KECO in South Korea.

35.    On or about January 29, 2014, JUNG caused U.S. Company 2 to ship 100 TGA2573 RFAs from the U.S. to South Korea.  JUNG and 8C caused this export to be filed in AES with the fraudulently obtained DDTC export license.  JUNG and 8C knew that KECO was not the true end-user for the items.  JUNG and 8C also knew that China, not South Korea, was the ultimate destination for the items.  JUNG and 8C further knew that had they requested a license to export to China, it would have been denied.

## U.S. Company 3 Orders

36.    From approximately May 27, 2013, to October 1, 2014, JUNG placed at least 18 orders for PAs manufactured by a U.S. company (U.S. Company 3).  The DOC has determined that all of those orders contained export-controlled PAs.

37.    For each of these orders, JUNG submitted a false EUC to U.S. Company 3. JUNG listed NSTEL, a South Korean manufacturing company, as the end user on 13 of the EUCs. JUNG listed 8C as the end user on the remaining five of the EUCs. HSI and SMPA interviewed a company manager at NSTEL, who confirmed that NSTEL was not the end user.

38.    From approximately September 3, 2013, to July 20, 2014, JUNG caused 15 of the orders to be shipped from the United States to South Korea. JUNG caused the AES filings for these orders to show "NLR," which would indicate "No [BIS export] License Required." Although the parts were export controlled, a license exception for the PAs exists for South Korea. JUNG was aware that if China had been listed as the ultimate destination, the export would have required a license, as there is no license exception for China.

### *Undercover HSI Company 1*

39.    Beginning on or about May 3, 2014, JUNG exchanged a series of emails with an HSI undercover agent ("UC1"). JUNG negotiated with UC1, who was posing as a U.S. based electronic parts broker, to obtain export-controlled parts. On or about May 4, 2014, JUNG placed an order (E8-140418) with UC1 for 100 TGA2573 RFAs, for a total purchase price of $47,057.

40.    On or about July 1, 2014, JUNG emailed signed copies of false EUCs to UC1. JUNG signed and completed the EUCs in both English and Korean at the direction of UC1. The EUCs contained export control warnings and specifically warned that defense articles exported from the United States had to remain with the end user listed on the export license. JUNG filed a false EUC, which listed KECO as the end user. HSI and SMPA interviewed a company manager at KECO, who confirmed that JUNG filed a false EUC, as KECO was not the end user.

41.     On or about May 13, 2014, Jung emailed with UC1 to negotiate the purchase of RHICs.  On or about May 27, 2014, Jung placed an order (E8-140527) for twenty UT9Q512E-20YPC and twenty UT28F256QLET-45UPC, for a total purchase price of $63,260.

42.     On or about August 4, 2014, Jung emailed UC1 a completed DOS DSP-83 Nontransfer and Use Certificate ("DSP-83") for the TGA2573 RF Amplifiers.  Jung falsely listed the end user as KECO and the country of ultimate destination as South Korea.

43.     On October 8, 2014, JUNG wire transferred $20,000 to an undercover bank account, which is located in the District of Columbia, as payment for this order.  Jung provided a copy of the wire transfer document to an undercover officer.

**(Conspiracy To Unlawfully Export U.S.-Origin Goods to China and
To Defraud the United States, in violation of 18 U.S.C. § 371)**

## COUNTS TWO through TWENTY-FOUR

**(Unlawful Exports or Attempted Unlawful Exports of U.S.-Origin Goods to China)**

44.     The allegations in Paragraphs 1 through 43 of Count One of this Indictment are incorporated and re-alleged by reference herein.

45.     On or about the dates listed as to each count below, within the District of Columbia and elsewhere, defendants JUNG and 8C, and their co-conspirators, both known and unknown, did willfully export and re-export, attempt to export and re-export, or cause to be exported and re-exported the U.S.-origin goods set out in Counts 2 through 24 from the United States to China, without having first obtained the required license from DDTC and/or DOC, located in the District of Columbia.

| Count | Approximate Date | Description of Goods | Quantity | Destination | Licensing Agency |
|-------|------------------|----------------------|----------|-------------|------------------|
| 2 | 08/16/2013 | RHICs | 10 | CHINA | DDTC |
| 3 | 10/17/2013 | RHICs | 10 | CHINA | DDTC |

| Count | Approximate Date | Description of Goods | Quantity | Destination | Licensing Agency |
|-------|------------------|----------------------|----------|-------------|------------------|
| 4 | 06/10/2013 | RFAs | 100 | CHINA | DDTC |
| 5 | 06/27/2013 | PAs | 25 | CHINA | DOC |
| 6 | 08/26/2013 | PAs | 20 | CHINA | DOC |
| 7 | 08/30/2013 | PAs | 1000 | CHINA | DOC |
| 8 | 09/23/2013 | PAs | 15 | CHINA | DOC |
| 9 | 10/25/2013 | PAs | 110 | CHINA | DOC |
| 10 | 11/22/2013 | PAs | 110 | CHINA | DOC |
| 11 | 12/24/2013 | PAs | 50 | CHINA | DOC |
| 12 | 01/03/2014 | PAs | 2,000 | CHINA | DOC |
| 13 | 01/13/2014 | PAs | 2,000 | CHINA | DOC |
| 14 | 01/29/2014 | PAs | 1,000 | CHINA | DOC |
| 15 | 02/24/2014 | PAs | 20 | CHINA | DOC |
| 16 | 03/31/2014 | PAs | 1,000 | CHINA | DOC |
| 17 | 04/25/2014 | PAs | 2,000 | CHINA | DOC |
| 18 | 05/26/2014 | PAs | 103 | CHINA | DOC |
| 19 | 06/18/2014 | PAs | 2,000 | CHINA | DOC |
| 20 | 09/19/2014 | PAs | 64 | CHINA | DOC |
| 21 | 09/19/2014 | PAs | 3,200 | CHINA | DOC |
| 22 | 10/01/2014 | PAs | 9 | CHINA | DOC |
| 23 | 05/03/2014 | RHICs | 40 | CHINA | DOC |
| 24 | 05/04/2014 | RFAs | 100 | CHINA | DDTC |

## COUNTS TWENTY-FIVE through FORTY-SEVEN

### (Material False Statements)

46.     The allegations in Paragraphs 1 through 43 of Count One of this Indictment are incorporated and re-alleged by reference herein.

47.     On or about the dates listed as to each count below, within the District of Columbia and elsewhere, defendants JUNG and 8C, in a matter within the jurisdiction of the DDTC and DOC, both of which are located in the District of Columbia, did knowingly and willfully falsify, conceal, and cover up and cause to be falsified, concealed, and covered up, by a trick, scheme, and device, material facts and made and caused to be made false, fictitious, and

fraudulent statements and representations as to a material fact, and made and used and caused to be made and used a false writing and document knowing the same to contain a false, fictitious, and fraudulent entry, by creating false and fictitious shipping documents, including EUCs which stated that the ultimate destination of the shipments was South Korea, when defendants and other conspirators there and then knew that these statements were false.

| **Count** | **Form** | **Date** | **False Statement and Representation** |
|---|---|---|---|
| 25 | EUC | 10/17/13 | End User is Genohco; Ultimate destination is South Korea |
| 26 | EUC | 10/15/13 | End User is Genohco; Ultimate destination is South Korea |
| 27 | EUC | 06/19/13 | End User is KECO; Ultimate destination is South Korea |
| 28 | EUC | 06/27/13 | End User is NSTEL; Ultimate destination is South Korea |
| 29 | EUC | 08/26/13 | End User is NSTEL; Ultimate destination is South Korea |
| 30 | EUC | 06/30/13 | End User is NSTEL; Ultimate destination is South Korea |
| 31 | EUC | 09/23/13 | End User is NSTEL; Ultimate destination is South Korea |
| 32 | EUC | 10/25/13 | End User is NSTEL; Ultimate destination is South Korea |
| 33 | EUC | 11/22/13 | End User is NSTEL; Ultimate destination is South Korea |
| 34 | EUC | 12/23/13 | End User is NSTEL; Ultimate destination is South Korea |
| 35 | EUC | 01/03/14 | End User is NSTEL; Ultimate destination is South Korea |
| 36 | EUC | 01/13/14 | End User is NSTEL; Ultimate destination is South Korea |
| 37 | EUC | 01/29/14 | End User is NSTEL; Ultimate destination is South Korea |
| 38 | EUC | 02/24/14 | End User is 8C; Ultimate destination is South Korea |
| 39 | EUC | 03/28/14 | End User is 8C; Ultimate destination is South Korea |
| 40 | EUC | 04/24/14 | End User is NSTEL; Ultimate destination is South Korea |
| 41 | EUC | 05/26/14 | End User is 8C; Ultimate destination is South Korea |
| 42 | EUC | 06/18/14 | End User is NSTEL; Ultimate destination is South Korea |
| 43 | EUC | 09/19/14 | End User is 8C; Ultimate destination is South Korea |
| 44 | EUC | 09/19/14 | End User is NSTEL; Ultimate destination is South Korea |
| 45 | EUC | 10/01/14 | End User is 8C; Ultimate destination is South Korea |
| 46 | EUC | 08/04/14 | End User is KECO; Ultimate destination is South Korea |
| 47 | EUC | 08/04/14 | End User is KECO; Ultimate destination is South Korea |

**(Material False Statements** in violation of 18 U.S.C. § 1001**)**

## COUNT FORTY-EIGHT

**(Conspiracy to Launder Monetary Instruments)**

16

48.     The allegations in Paragraphs 1 through 47 of this Indictment are incorporated and re-alleged by reference herein.

## THE CONSPIRACY

49.     Beginning as early as in or around May 24, 2013, the exact date being unknown to the Grand Jury, and continuing through in or around October 8, 2014, within the extraterritorial jurisdiction of the United States, the District of Columbia, and elsewhere, defendants JUNG and 8C, did knowingly, combine, conspire, confederate and agree with others known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1956(a)(2)(A), that is, by transporting, transmitting, and transferring and attempting to transport, transmit, and transfer, monetary instruments and funds to a place in the United States from and through a place outside the United States, that is the South Korea, with the intent to promote the carrying on of specified unlawful activities, that is, criminal violations of the AECA and the IEEPA.

50.     The objects of the conspiracy were:

    a.      to illegally enrich the co-conspirators; and

    b.      to promote the co-conspirators' illegal procurement scheme.

## MANNER AND MEANS OF THE CONSPIRACY

51.     The manner and means by which defendants and other conspirators sought to accomplish the objects of the conspiracy included, among others, the following:

    a.      Defendants and other conspirators planned and acted outside of the United States to acquire U.S.-origin goods.

b.      Defendants and other conspirators solicited purchase orders for U.S.-origin goods from companies in the United States to China, through South Korea.

c.      Defendants and other conspirators wired money from accounts outside the United States to accounts of U.S. companies inside the United States, as payment for the purchase of U.S.-origin goods.

d.      Defendants sent out follow up invoices to their customers in China, in which the defendants marked up the price of the U.S.-origin goods.

52.     It was part of the conspiracy that defendants, upon receipt of goods in the contract engage in illegal financial transactions totaling $806,943.66 involving the above identified criminally derived property, by wiring funds into the United States to promote the export, re-export, and attempt to export and re-export U.S.-origin goods from the United States to China, without having first obtained the required license from DDTC or DOC, both of which are located in the District of Columbia.  Defendants made the following transfers:

| **Date** | **Wired From** | **Wired To** | **Amount Wired (USD)** |
|----------|----------------|--------------|------------------------|
| 02/11/14 | South Korea | United States | 20,140.00 |
| 02/19/14 | South Korea | United States | 27,170.00 |
| 06/17/14 | South Korea | United States | 47,057.00 |
| 07/01/13 | South Korea | United States | 1,729.00 |
| 08/29/13 | South Korea | United States | 6,551.70 |
| 09/03/13 | South Korea | United States | 34,650.00 |
| 09/26/13 | South Korea | United States | 2,743.80 |
| 09/26/13 | South Korea | United States | 4,929.00 |
| 11/29/13 | South Korea | United States | 8,906.60 |
| 12/24/13 | South Korea | United States | 2,611.50 |
| 01/03/14 | South Korea | United States | 67,976.00 |
| 01/17/14 | South Korea | United States | 97,140.00 |
| 01/17/14 | South Korea | United States | 48,570.00 |
| 04/03/14 | South Korea | United States | 3,292.56 |
| 04/03/14 | South Korea | United States | 45,170.00 |

| 04/28/14 | South Korea | United States | 68,000.00 |
|----------|-------------|---------------|-----------|
| 05/27/14 | South Korea | United States | 13,138.00 |
| 06/19/14 | South Korea | United States | 68,000.00 |
| 09/19/14 | South Korea | United States | 10,757.40 |
| 09/19/14 | South Korea | United States | 108,800.00 |
| 10/01/14 | South Korea | United States | 9,294.10 |
| 05/13/14 | South Korea | United States | 37,057.00 |
| 06/11/14 | South Korea | United States | 53,260.00 |
| 10/08/14 | South Korea | United States | 20,000.00 |
|          |             |               | **806,943.66** |

(**Conspiracy to Launder Monetary Instruments**, in violation of 18 U.S.C. § 1956(h).)

## FORFEITURE ALLEGATION

53.     Upon conviction of any of the offenses alleged in Counts One through Twenty-Four, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).   The United States will also seek a forfeiture money judgment against the defendant of at least $806,943.66.

54.     Upon conviction of the offense alleged in Count Forty-Eight, the defendant shall forfeit to the United States any property, real or personal, involved in this offense, or any property traceable to such property, pursuant to 18 U.S.C. § 982(a)(1).   The United States will also seek a forfeiture money judgment against the defendant of at least $806,943.66.

55.     If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with, a third party;

c.     has been placed beyond the jurisdiction of the Court;

d.     has been substantially diminished in value; or

e.   has been commingled with other property that cannot be divided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to 21 U.S.C. § 853(p).

(**Criminal Forfeiture,** pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1);
21 U.S.C. § 853(p); and 28 U.S.C. § 2461(c).)

A TRUE BILL

FOREPERSON

*Channing D. Phillips /sm/*

Attorney of the United States in
and for the District of Columbia

FOREPERSON OF THE GRAND JURY

Presented By: